### Hayden C. McKINNEY,
Plaintiff-Appellee,

v.

### FELDSPAR CORPORATION,
Defendant-Appellant.

Supreme Court of Tennessee.

Feb. 23, 1981.

James S. Pate, Erwin (Paul J. Sherwood, Erwin, of counsel), for plaintiff-appellee.

Michael J. Hickie, Johnson City (Weller, Miller, Carrier & Miller, Johnson City, of counsel), for defendant-appellant.

## OPINION

BROCK, Justice.

This is a worker's compensation case. The Chancellor awarded benefits for permanent total disability, finding that the plaintiff suffers permanent total disability from silicosis contracted from the breathing of silica dust while employed in the Feldspar mine of the defendant.

The principal issue raised by the defendant is that the statute of limitations of one year, T.C.A., § 50–1017, ran prior the the filing of the plaintiff's suit on November 28, 1978.

The plaintiff contends that he was not aware of his cause of action until he was clearly and unequivocally informed by his physician, Dr. Nat Hyder, on November 11, 1978, that he suffered from silicosis which was brought about by his breathing of silica dust while employed from 1954 to 1962 in the mine operated by the defendant. The defendant asserts, however, that the plaintiff knew that he had a compensable disease on November 11, 1977, when he was examined by Dr. C. P. Cole. The Chancellor found this issue in favor of the plaintiff, so that, the question before us is whether there is any material evidence to uphold that finding.

■ The rule established by our decisions is that the statute of limitations does not begin to run in cases of occupational disease until the disease manifests itself in an incapacity for work by the employee and the employee acquires actual or constructive knowledge from a medical expert that he in fact suffers from the occupational disease and that it arose out of and in the course of his employment. *Consolidation Coal Company v. Brown*, 225 Tenn. 572, 474 S.W.2d 416 (1971); *Tennessee Products & Chemical Corp. v. Reeves*, 220 Tenn. 148, 415 S.W.2d 118 (1967); *Christopher v. Consolidated Coal Company*, 222 Tenn. 727, 440 S.W.2d 281 (1969).

Dr. Cole's testimony concerning his diagnosis of the plaintiff's condition in November, 1977, and his explanation thereof, if any, to the plaintiff, was ambiguous and equivocal. For example:

"Q. Mr. McKinney has already testified that you told him he had 'dust'.

"A. Yeah. I did tell him that, I imagine.

"Q. How would that relate ...

"A. I don't have it in my records. OK, But I assume if that's what he said, then perhaps that's what I told him.

"Q. How would that relate to your diagnosis of silicosis?

"A. Well, some people equilerate (sic) dust and silicosis as meaning the same thing. Dust on the lungs can mean exposure to silica, rock dust, asbestos dust, you know. There's an infinite number of things. But really, just all sorts of things, numerous things are, are actually dust.

\*     \*     \*     \*     \*     \*

"Q. Did you and he discuss the possibility that he might have silicosis? Let me ask you this first, Doctor. Do you discuss your diagnoses with your patients as a matter of course?

"A. As a matter of course I do. I don't have the records of exactly what I discussed with him at that, you know, at the time we discharged him from the hospital.

\*     \*     \*     \*     \*     \*

"Q. Doctor, did you relate in your discussion of your diagnosis with Mr. McKinney the relationship between his silicosis and his previous employment?

"A. I'm sure I covered the possibility with him that he may have silicosis and that it would be related to his employment.

\*     \*     \*     \*     \*     \*"

Cross examination:

"Q. Now, in the final diagnosis ...

"A. Un uh.

"Q. Your first point was chronic obstructive airways disease, severe emphysema and bronchitis, was it not?

"A. It was.

"Q. And your second point was mild interstitial fibrosis, most likely secondary to silica was it not?

"A. Uh huh.

"Q. And there is some little equivocation of that second point, is there not, in the use of the words 'most likely?'

"A. Sure, there has to be unless you actually obtain tissue and look at it under the microscope.

"Q. Which ...

"A. You can't say for sure. Now, you can obtain lung tissue and sometimes you are able under the microscope to see, actually see the crystals of silica dust.

"Q. And then you make an absolute positive ...

"A. Yes.

"Q. ... diagnosis?

"A. That's right.

"Q. But that wasn't done in this case was it?

"A. It was not.

"A. All right, Sir. In the discharge summary at the bottom of the page, first sentence in the last paragraph at the bottom of the page you say, 'it was our assessment that he had obstructive airways disease secondary to smoking with emphysema and bronchitis and possibly an interstitial fibrosis secondary to silica,' is that not right?

"A. Uh huh.

\*     \*     \*     \*     \*     \*

"Q. Well, we'll let the Doctor answer. Go ahead.

"A. To be honest with you, I can't remember the terminology I used when—unfortunately. I wish I could, but I can't remember the ter-minology I used when I discussed Mr. McKinney's problem with him. Routinely, you know, frequently what I will do is when I see a patient for someone else on a referral basis is I'll call the physician up and relate things to him. I may not always dictate a letter or dictate it into the chart. It would be nice if we had everything with his chart, but frequently I'll just simply telephone the physician, like Dr. Hyder, and I honestly can't remember what all I told Dr. Hyder a year what, what, a year and a half ago, I guess."

The plaintiff, McKinney, testified that on the occasion of his examination by Dr. Cole in November, 1977, that the Doctor remarked to him "Did you know you have dust?" To which plaintiff replied "No, Sir, I don't think I've got any dust." He testified that Dr. Cole never stated to him that he suffered from silicosis or that he suffered from any disease contracted while employed in the defendant's mine. He denies that he had any knowledge that he suffered from silicosis and that it was contracted during his work for the defendant until so informed by Dr. Hyder in November, 1978.

■ In our opinion the record supports the finding of the Chancellor that within the rule stated above the plaintiff did not become aware of the fact that his disability was caused by the disease of silicosis contracted during his employment with the defendant until so informed by Dr. Hyder on November 13, 1978. His suit was filed well within one year from that date. The Chancellor was justified in concluding that Dr. C. P. Cole did not make known to the plaintiff on or about November 11, 1977, that he was suffering from silicosis or any occupational disease arising out of and in the course of his employment.

■ The defendant also insists that the Chancellor erred in fixing the average weekly wage of the plaintiff at $100.24 per week. The evidence was that the defend-

ant's plant at which the plaintiff worked from 1954 to 1962 was closed in 1962. Thereafter, the plaintiff began working full time at a supermarket where he worked until 1972 at which time he voluntarily retired and began receiving social security benefits because he had reached the age of 62 years. Thereafter, the plaintiff worked part time at the supermarket averaging 30 hours of work per week for which he was paid $2.30 an hour. Applying the rule set out in T.C.A., § 50–902(c), for computing the average weekly wage of an employee the plaintiff's average weekly wage in this case would have been $69.00, which would have converted into a compensation rate of $46.00 per week. Nevertheless, the Chancellor found the plaintiff's average weekly wage to be $100.24 per week which he based upon a finding that the plaintiff would have worked a full 40 hours per week if he had "felt like it." In determining the plaintiff's average weekly wage in this manner, we are of the opinion the Chancellor erred.

■ A computation of the "average weekly wage" of a part time employee, such as the plaintiff, must be based upon his *actual* part time earnings rather than upon the basis of the standard hourly wage or the standard work week of 40 hours. *Gaw v. Raymer*, Tenn., 553 S.W.2d 576 (1977); *Johnson v. Aero Mayflower Transit Company*, 221 Tenn. 219, 425 S.W.2d 757 (1968); *White v. Pinkerton Co.*, 155 Tenn. 229, 291 S.W. 448 (1927). The average weekly wage of a part time employee is found by dividing the total wages received during the year by the number of weeks during which the employee received wages.

We conclude that the evidence does not support the finding of the Chancellor with respect to the average weekly wage. The average weekly wage of this employee was $69.00.

The decree of the Chancellor is modified by reducing the average weekly wage from $100.24 to $69.00; in all other things his decree is affirmed. Two-thirds of the cost incurred on appeal are taxed against the defendant; one-third of such costs are taxed against the plaintiff.

HARBISON, C. J., and FONES and COOPER, JJ., concur.