FILED

December 22, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 1:31 PM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| REGINALD WATSON, | ) | Docket No. 2015-06-1358 |
| Employee, | ) | |
| v. | ) | State File No. 93345-2015 |
| LABOR SMART, | ) | |
| Employer, | ) | Judge Joshua Davis Baker |
| and | ) | |
| | ) | |
| SUNZ INSURANCE, | ) | |
| Insurer. | ) | |
| | ) | |

## AMENDED EXPEDITED HEARING ORDER GRANTING
## TEMPORARY DISABILITY BENEFITS

This matter came before the undersigned workers' compensation judge on the Request for Expedited Hearing filed by the employee, Reginald Watson, pursuant to Tennessee Code Annotated section 50-6-239 (2016). The present focus of this case is whether Labor Smart must provide Mr. Watson with temporary disability benefits from September 1, 2016, to the present. The central legal issue is whether Mr. Watson can demonstrate a likelihood of success at a trial on the merits of this issue. For the reasons set forth below, the Court finds Mr. Watson is likely to succeed at a hearing on the merits in proving entitlement to temporary disability benefits based on the evidence presented at this time.[1]

## History of Claim

Mr. Watson is a fifty-one-year-old resident of Davidson County, Tennessee. He worked for Labor Smart, a temporary staffing agency, in various assignments. Personnel records from Labor Smart showed Mr. Watson worked as a part-time employee of the company. (Ex. 7.) On Saturday, July 18, 2015, Labor Smart assigned Mr. Watson to

---

[1] A complete listing of exhibits and the technical record admitted at the Expedited Hearing is attached to this Order as an appendix.

1

work at Two Men and A Truck, a moving company. On that day, Mr. Watson was using a dolly to unload furniture from a van when he stepped off the side of the truck ramp and fell to the ground, injuring his head and back. Brandon, an on-site supervisor, and another employee were present at the time of the incident. Mr. Watson's back and head pain required him to sit down the remainder of the day, and his fiancée, Michelle Goodner, drove him home from work that afternoon.

The following morning, Mr. Watson presented at Nashville General Hospital emergency department complaining of right hip, back, and left neck pain from falling at work the day before. (Ex. 2 at 1.) His physical examination indicated no evidence of head trauma and a non-tender neck with painless range of motion. *Id.* at 4. Mr. Watson indicated it was painful to bear weight on his right leg. *Id.* at 6. Although the medical records do not mention a head injury, Mr. Watson testified he told the emergency room physician, Dr. Rex Sparks, that he hit his head when he fell.

At trial, Mr. Watson testified that on July 20, he presented the hospital papers to Matt Jaggers, his Labor Smart supervisor. Mr. Watson testified he believed Mr. Jaggers would complete an accident report and someone at Labor Smart would contact him about medical care. Mr. Watson also testified that, in the days following his delivery of the papers, he told managers at Labor Smart he needed medical treatment, but he received none.

Mr. Watson returned to Nashville General Hospital on August 2 complaining of increased low-back pain. *Id.* at 20. Medical records indicated decreased range of motion in his back and a diagnosis of low back strain. The records also indicated complaints of headache since the July 2015 work incident. *Id.* at 35. Because of Mr. Watson's headache complaints, he underwent a CT scan, which yielded normal results. *Id.* at 42.

Mr. Watson testified that after his injury he tried to return to work at Labor Smart because it was his only means of support. He stated, however, that he could no longer perform physical labor jobs because his back and head pain were "killing him." This resulted in Labor Smart reducing the number of placements and works hours it offered Mr. Watson. September 1 was the last day he worked for Labor Smart, and he testified he has been physically unable to work, due to his headaches and back pain, since he left Labor Smart.

In October 2015, Mr. Watson sought treatment at Neighborhood Health Clinic. Dr. Jule West diagnosed back pain and chronic headache from falling off the back of a moving truck and hitting his back, hip, and head. (Ex. 1 at 1.) Dr. West referred Mr. Watson for brain and spine MRIs. Mr. Watson's brain MRI was normal except for "very mild parasinus disease;" his neck MRI showed two small areas of bulging discs "C4-C5, C5-C6;" and the lumbar MRI showed "paracentral disc protrusion (L5-S1)." *Id.* at 20.

He continued to treat with Dr. West and saw her approximately eight times. Dr. West's medical notes reflect Mr. Watson complained of constant headaches caused by vision problems and bright lights. *Id.* at 19. She prescribed muscle relaxers and medication, and eventually referred Mr. Watson to Dr. Nandakum B. Vittal, a neurologist, for his headaches. *Id.* at 25. Dr. Vittal suggested occipital nerve blocks for headache relief, but Mr. Watson testified he has not undergone this treatment recommendation because of the cost.

On June 1, 2016, Dr. West wrote:

This patient has been in my primary care since October 5, 2015.

I am asked to comment on diagnoses and injuries sustained and resulting from a traumatic fall from the back of the truck (which did include head injury and loss of consciousness) on July 18, 2015, per Mr. Watson. I was not caring for Mr. Watson at that time. I became his primary care provider on October 5, 2015. I cannot comment on initial injuries, evaluation, worked up, imaging or treatment.

Imaging obtained by me November 5, 2015[,] demonstrated bulging disc's [sic] at cervical vertebrae C4-5 and C5-6 per cervical MRI. *Brain MRI was normal.* Lumbar MRI obtained 11/17/15 demonstrated paracentral disc protrusion L5-S1, mild narrowing left neuroforaminal. In lieu of physical therapy, Mr. Watson has been doing aqua classes at the YMCA.

*As I am not a spine expert, I cannot comment on medical certainty that the abnormalities result from trauma, however it is possible the impact and fall are responsible.*

I can say, with a reasonable degree of medical certainty, that Mr. Watson has had severe and persistent posttraumatic headache since the time of injury. This has required extensive evaluation by neurology and multiple modalities to control pain. Currently it would be impossible for Mr. Watson to sustain any consistent and regular employment secondary to pain and lack of function due to his headaches.

He is currently undergoing medical treatment per neurology and per those records, the next and last intervention prior to reaching maximum medical treatment will be bilateral greater occipital nerve block (to attempt pain control for headache) per Dr. Vittal, neurologist at Nashville General Hospital.

*Id.* at 29. (Emphasis added.) In addition to this medical note, Dr. West also completed a

3

questionnaire where she causally related Mr. Watson's headaches and his inability to work to his July 18, 2015 accident. (Ex. 5.)

At the expedited hearing, Mr. Watson testified that prior to his injury he had no problems with his lower back, headaches, or difficulties with his vision. Since the fall, he has sensitivity to bright light and loud noise and suffers from constant headaches. He also had two blackouts, which he attributes to his headaches. He testified he never blacked-out before the July 18, 2015 injury.

Mr. Watson testified he had received no income since September 1. He was forced to borrow money from family members. He also sold his tools, valued at about $5,000, for $600 because he needed the money. Mr. Watson was denied unemployment benefits because he was not physically able do any job for which he qualified.

Mr. Watson testified that on the day of the expedited hearing, he saw Dr. Strickland as an authorized treating physician from a panel offered by Labor Smart. This was the first time he saw an authorized physician in the approximately fourteen months since his accident. The only medical treatment Labor Smart paid for prior to that time was his initial hospital visit. It was only after hiring an attorney that Mr. Watson received two panels, one for a neurologist and one for an orthopedic surgeon.

Mr. Watson testified an ombudsman at the Bureau helped him complete his PBD, which explains the different handwriting on the form. He completed the employee information part, but not the explanation of issues section that omitted his headaches.

Ms. Goodner testified she has known Mr. Watson for six years and they live together in the same home. On the date of injury, Mr. Watson returned home from work and "didn't look right." Ms. Goodner noticed Mr. Watson had a knot on his head. Since his injury, Ms. Goodner stated Mr. Watson is unable to do anything and his head constantly hurts. She has to remind him to take his medicine and drive him to his doctor appointments. She stated he needs assistance getting in and out of a bed or a vehicle, he cannot do his daily activities, and he has difficulty sleeping. Before the injury he slept well, had no depression, enjoyed working, and entertained friends. Ms. Goodner said they no longer have company or entertain since the injury.

Labor Smart argued medical records fail to substantiate the several injuries Mr. Watson now claims. Hospital emergency room records from July 19, 2015, show Mr. Watson complained of right hip pain, instead of left hip pain as he now claims. (Ex. 2 at 1.) In addition, medical records after the work incident show no report of having any head injury or headaches. *Id.* at 4.

Labor Smart also argued that Mr. Watson's PBD filed with the Bureau on December 28, 2015, only described injuries to his neck and lower back, with no mention

4

of headaches or any head injury from hitting his head on concrete. (T.R. 3.) Medical records document that in November Dr. Vittal ordered an MRI of Mr. Watson's head, and the MRI diagnosed perinasal sinus disease, which has no relationship to any workplace event. (Ex. 1 at 41.) One of the symptoms of perinasal sinus disease is headaches.

## Findings of Fact and Conclusions of Law

### I.  Labor Smart failed to provide Mr. Watson timely medical care.

There are several issues of concern in this case. In particular, the amount of time between Mr. Watson's injury and Labor Smart's provision of medical care is concerning. Upon being provided notice of a workplace injury, the Workers' Compensation Law requires an employer to "designate a group of three (3) or more independent reputable physicians, surgeons, chiropractors or specialty practice groups if available in the injured employee's community or, if not so available, in accordance with subdivision (a)(3)(B), from which the injured employee shall select one (1) to be the treating physician." Tenn. Code Ann. § 50-6-204(a)(3)(A)(i) (2016). The administrative rules governing procedures in the Bureau of Worker's Compensation provide, "[u]pon notice of any workplace injury, other than a minor injury for which no person could reasonably believe requires treatment from a physician, the employer shall immediately provide the injured employee a panel of physicians that meets the statutory requirements for treatment of the injury." Tenn. Comp. R. & Regs. 0800-02-01-.25(1) (2016). Failure to provide a panel could result in the assessment of a civil penalty of up to $5,000 against the employer. *See* Tenn. Comp. R. & Regs. 0800-02-01-.25(1) (2016).

Here, Labor Smart did not timely provide Mr. Watson panels of physicians. Mr. Watson's accident occurred on July 18, 2015, and there is no dispute that the accident occurred and Labor Smart had notice of its occurrence. Despite its notice of the injury, Mr. Watson saw a physician for the first time on the day of the hearing, more than a year after the accident occurred. Because Labor Smart failed to timely provide medical care. The Court refers this matter to the penalty unit to consider whether Labor Smart should be assessed a civil penalty for its delay in providing Mr. Watson a panel.

Additionally, because Labor Smart failed to provide timely medical care, Mr. Watson could have asked that he be allowed to continue treating with Drs. West and Vitale. If an employer fails to provide a panel, it risks having to pay for all reasonable and necessary medical expenses incurred by an employee for treatment with an unauthorized physician and also risks having to provide continuing care with the unauthorized physician. *See McCreary v. Yasuda Fire & Marine Ins. Co. of Amer.*, No. 01S01-9507-CH-00106, 1996 Tenn. LEXIS 102, at *5-6 (Tenn. Workers' Comp. Panel Feb. 20, 1996); *Young v. Young Electric*, No. 2015-06-0860, 2016 TN Wrk. Comp. App. Bd. LEXIS 24 at *16-17 (Tenn. Workers' Comp. App. Bd. May 25, 2016) (Holding that

5

the employer who failed to set an appointment with the panel physician was required to provide continued care with the unauthorized physician who treated the employee.). However, at the outset of the hearing, the parties agreed that only temporary disability benefits are at issue, so the Court will not address medical care.

## II.     Mr. Watson is entitled to temporary disability benefits.

Mr. Watson seeks temporary total disability benefits for the period of time Dr. West indicated he was unable to work following the accident. In order to recover temporary total disability benefits, Mr. Watson must show (1) he is totally disabled and unable to work due to a compensable injury, (2) the work injury and inability to work are causally connected, and (3) the duration of the disability. *Gray v. Cullom Mach., Tool & Die, Inc.*, 152 S.W.3d 439, 443 (Tenn. 2004); *Jewell v. Cobble Constr. and Arcus Restoration,* No. 2014-05-0003, 2015 TN Wrk. Comp. App. Bd. LEXIS 1, at *21 (Tenn. Workers' Comp. App. Bd. Jan. 12, 2015). An employee may recover temporary total disability benefits until the employee is able to return to work or attains maximum medical improvement. *Prince v. Sentry Ins. Co.*, 908 S.W.2d 937, 939 (Tenn. 1995). While it is a close issue, the Court finds Mr. Watson carried his burden of proving a likelihood of success at a hearing on the merits in proving that his workplace accident rendered him unable to work.

In her causation letter, Dr. West indicated Mr. Watson could not work from July 18, 2015, until the present due to debilitating headaches that resulted from his workplace accident. (Ex. 5.) In her medical note, Dr. West indicated that an MRI of Mr. Watson's brain was "normal." (Ex. 1 at 29.) She also acknowledged that Mr. Watson has spinal trauma as indicated on the MRI but stated, "[a]s I am not a spine expert, I cannot comment on medical certainty that the abnormalities result from trauma, however it is possible the impact and fall are responsible." *Id*. The combination of the these two statements indicates to the Court that Dr. West is unsure whether the headaches Mr. Watson has are coming from his head or from his neck injuries. Despite this apparent uncertainty, Dr. West responded definitively that his headaches, more likely than not, resulted primarily from his workplace accident and that his injuries prevent him from working. (Ex. 5.) The Court has no other medical opinion at this time.

In addition to the medical testimony, the lay testimony also showed the Mr. Watson cannot work. Tennessee courts have long held that the employee's credible testimony of injury is relevant to the determination of the work-relatedness of an injury. *See Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991); *Tindall v. Waring Park Ass'n*, 725 S.W.2d 935, 937 (Tenn. 1987). Mr. Watson and Ms. Goodner both testified to his physical condition after the fall and his inability to work. The Court finds their testimony credible.

For his part, Mr. Watson complained of headaches and syncope episodes that

occurred after the fall. He also testified he did not have headaches and had not passed out prior to the accident. He further testified he has been unable to work since leaving his employment with Labor Smart on September 1, 2015, due to his headaches and back pain. Additionally, even though Mr. Watson has been without income for an extended period of time, he chose to sell his tools rather than seek income through work, which indicates to this Court that he is unable to maintain employment.

In addition to Mr. Watson's testimony, Ms. Goodner testified that Mr. Watson has been unable to do anything since the accident and has constant headaches. Furthermore, Mr. Watson, who worked consistently before the accident, was denied unemployment benefits because he cannot perform work in his injured condition.

In consideration of all these factors, the Court finds Mr. Watson is likely to prevail at a hearing on the merits in proving his workplace accident has rendered him unable to work from the time he left his employment with Labor Smart on September 1, 2015, through the date of this order. Such payments shall continue until Mr. Watson is released to return to work or placed at maximum medical improvement.

Mr. Watson asserted that benefits should be paid at the maximum compensation rate because Labor Smart failed to timely file a wage statement. He argued that the prior law gave the Court authority to order payment at the maximum rate under such circumstances. *See* Tenn. Code Ann. § 50-6-201(c) (2011). While Mr. Watson admitted the provision providing for payment at the maximum compensation rate was removed from the law during the 2013 reform of the Workers' Compensation Law, he nonetheless argued that this Court still has discretion to order payment at the maximum compensation rate. The Court disagrees.

"The Workers' Compensation Law is entirely a creature of statute, and the rights and responsibilities of the parties are derived solely from the statutes." *Cooper v. Logistics Insight Corp*., 395 S.W.3d 632, 640 (Tenn. 2013). Because the law is statutory, the legislature may adjust the benefits available as it sees fit. Here, the legislature determined it would no longer require an employer who fails to timely file a wage statement to pay benefits at the maximum compensation rate. Labor Smart shall pay Mr. Watson temporary disability benefits at 66 2/3% of his average weekly wage.

Here, the personnel records showed that Mr. Watson worked intermittently for Labor Smart from May 27 through September 1, 2015, a period of fourteen weeks. During that period of time, he worked anywhere from six hours to thirty-two and a half hours per week. (Ex. 7.) Based on this information, the Court finds Mr. Watson worked as a part-time employee for Labor Smart. The average weekly wage of a part-time "should be determined by dividing the total actual wages of the 52-week period by the number of weeks in which the employee received wages." *Russell v. Genesco*, 651 S.W.2d 206, 208 (Tenn. 1983) (citing *McKinney v. Feldspar Corp.*, 612 S.W.2d 157

(Tenn. 1981); *Gaw v. Raymer*, 553 S.W.2d 576 (Tenn. 1977)).

Upon review of the personnel records, the Court finds Mr. Watson received wages in twelve of the fourteen weeks. He received a total of $2,392.31 for working those twelve weeks resulting in average weekly wage of $199.36, and a compensation rate of $132.91 per week.

**IT IS, THEREFORE, ORDERED** as follows:

1. Labor Smart shall pay Mr. Watson accrued temporary total disability benefits from September 2, 2015, through the date of this order—a period of sixty-eight weeks and one day—for a total accrued benefit of $9,056.87. Labor Smart shall also continue benefit payments until Mr. Watson is no longer eligible to receive them.

2. Tom Tucker, counsel for Mr. Watson, has provided good and valuable services and is entitled to a fee equaling twenty-percent of the accrued temporary disability benefits or, $1,811.37.

3. Labor Smart shall provide documentation of why it should not be assessed a civil penalty pursuant to Tennessee Code Annotated section 50-6-205(b)(3) for its failure to timely pay temporary disability benefits within seven business days of entry of this order.

4. This matter is set for a Scheduling Hearing on February 13, 2017, at 10:00 a.m. (CDT). The Court will convene the Scheduling Hearing via teleconference. You must call 615-741-2113 or toll-free at 855-874-0474 to participate in the Initial Hearing.

5. The clerk shall forward a copy of this order to the penalty unit for consideration of a civil penalty against Labor Smart for its failure to provide timely medical care.

6. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

7. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED ON THIS THE 22nd DAY OF DECEMBER, 2016.**

_____

**Judge Joshua Davis Baker**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven business days* of the date the Workers' Compensation Judge entered the Expedited Hearing Order.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The parties, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a joint statement of the evidence within ten calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board.

6. If the appellant elects to file a position statement in support of the interlocutory appeal, the appellant shall file such position statement with the Court Clerk within three business days of the expiration of the time to file a transcript or statement of the evidence, specifying the issues presented for review and including any argument in support thereof. A party opposing the appeal shall file a response, if

any, with the Court Clerk within three business days of the filing of the appellant's position statement. All position statements pertaining to an appeal of an interlocutory order should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

**APPENDIX**

Exhibits:

1.  Medical records filed
2.  Medical records filed
3.  Mr. Watson's affidavit
4.  Michelle Goodner's affidavit
5.  Dr. Jule West medical report
6.  Wage statement and hours printout
7.  First Report of Injury

Technical record:[2]

1.  Petition for Benefit Determination
2.  Dispute Certification Notice
3.  Request for Expedited Hearing
4.  Division of Employment Security Agency Decision denying unemployment benefits
5.  Medical Certificate/Unemployment Insurance Benefits
6.  Mr. Watson's position statement
7.  Labor Smart's Response to Request for Expedited Hearing

---

[2] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent to the following recipients by the following methods of service on this the 22nd day of December, 2016.

| Name | Cert Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|------|-----------|------------------|---------|------------|-----------|---------------|
| Thomas W. Tucker III | | | | | x | tomtucker@bellsouth.net |
| Jordan Puryear, Attorney | | | | | x | jordan.puryear@leitnerfirm.com |

_____

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

13